Ned GILL, Appellant,

v.

H. A. PHILLIPS, Trustee of Tinney Produce Company, Inc., Bankrupt, Appellee.

No. 20780.

United States Court of Appeals
Fifth Circuit.

Oct. 15, 1964.

Bennett B. Patterson, Houston, Tex., for appellant.

Thad Grundy, Houston Tex., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This interlocutory appeal, which was filed pursuant to 28 U.S.C.A. § 1292(b), presents for our determination the difficult question whether, under the facts and in the circumstances before us, the appellant Ned Gill impliedly consented to the summary jurisdiction of the Referee in Bankruptcy to cancel and set aside certain allegedly fraudulent or preferential transfers made to Gill by the bankrupt, Tinney Produce Company, Inc.[1] Since we do not agree with the District Court that the findings of the referee support a conclusion that Gill's actions constituted a consent to summary jurisdiction, we reverse.

The facts, although undisputed, are complex, and it is necessary to explain the financial arrangements which Gill made with the bankrupt and to detail with some particularity the rather involved chain of events which transpired in the Bankruptcy Court following the filing of the bankruptcy petition.

The bankrupt, Tinney Produce Company, Inc., was incorporated in Texas in April 1958. In order to obtain sufficient working capital to commence operations, it effected a financial arrangement with Gill and the Bank of Texas. In return for Gill's guaranty of the bankrupt's note, a deed of trust on the bankrupt's realty, a chattel mortgage of certain of its personal property, an assignment of its accounts receivable, and a pledge of all its capital stock, the Bank of Texas agreed to loan the bankrupt $100,000.00. The amount of this loan was subsequently increased to $200,000.00 upon the strength of Gill's guaranty of a note for that amount. In consideration of Gill's guaranty on the note, the bankrupt's four shareholders conveyed all the capital stock to him in a voting trust, which was to be effective for ten years or until the bankrupt's indebtedness to the Bank of Texas had been paid. Also, Gill was granted an option, subordinate to the Bank's pledge, to purchase the capital stock of the bankrupt. Hence, Gill bargained for an opportunity to buy into the corporation after it had begun to operate successfully. However, at no time did Gill exercise either the stock option or the powers he held under the voting trust.

The company did not prosper, and in March 1959 it borrowed $50,000.00 from Gill. This loan was unsecured.[2] Apparently the bankrupt began repaying this amount almost immediately, for by the time of the filing of the bankruptcy petition, the balance owing to Gill on this note was only $12,500.00.

Even with the additional financial aid which Gill had furnished, the company faltered. Its demise as a going concern was perhaps hastened by the resignation of its President after he had been accused of conduct contrary to the company's interest, and the withdrawal of two other officers to set up a competing business. By December 12, 1959, the corporation was a mere shell, all the officers and directors having resigned. On January 4, 1960, an involuntary petition in bankruptcy was filed against the company in the District Court for the Southern District of Texas.

1. Hereinafter referred to as "the bankrupt" or "the company."

2. A deed of trust and chattel mortgage were executed by the company in Gill's favor in November 1959 to secure this loan. However, these security interests were released by Gill on December 31, 1959, upon a partial repayment of the loan. Therefore, Gill presently holds no security for this loan.

For almost a year and a half, no action was taken in the bankruptcy proceedings, although various pleadings were filed by the petitioning creditors, the bankrupt, and Gill. The reason for the delay is not apparent from the record.

During this period, however, Gill purchased the $200,000.00 note which the Bank of Texas held and which had a balance due of $57,866.32. The bank then assigned to Gill all the security which it held on the claim, including all the capital stock in the bankrupt corporation which had been pledged to it. On May 31, 1961, Gill foreclosed on the pledged stock and became sole owner of the company. This foreclosure was evidently for the purpose of effecting an arrangement under Chapter XI of the Bankruptcy Act with the company's unsecured creditors. Four days after Gill's foreclosure on the stock, the company, now clearly under Gill's control, petitioned for an arrangement pursuant to § 321 of Chapter XI, 11 U.S. C.A. § 721. Under the terms of the bankrupt's proposal, the unsecured creditors had an election to accept either full payment of their claims over an extended period of time out of the net distributable earnings of the company, or a ten per cent final cash settlement. Gill contracted with the company to furnish the amount necessary to make the ten per cent cash payments called for under the arrangement proposal. Gill also agreed not to foreclose on the security interests he held on the bankrupt's property so long as payments were made to him on the secured indebtedness out of the net distributable earnings of the company.[3]

On July 20, 1961, Gill filed Proof of Claim No. 48, which asserted that a $12,-500.00 balance was owing to Gill on the $50,000.00 unsecured note, and Proof of Claim No. 49, a priority claim for $27,-272.74, the amount Gill had paid to the lessor of the bankrupt, Houston Produce Terminal, Inc., to preserve the lease on the premises that the bankrupt occupied. Gill voted these two claims, as well as five or six claims of other creditors, over some of which he had powers of attorney, in favor of the arrangement. In addition, Gill's attorney filed claims on behalf of at least twenty-five other creditors and voted them in favor of the proposal. The arrangement was accepted by the requisite number of creditors, after the amount which would be paid to those unsecured creditors who elected to accept an immediate cash settlement was increased from ten to fifteen per cent of their claims. The referee confirmed the arrangement on October 13, 1961, and directed the bankrupt to deposit $35,-000.00 by October 23 to satisfy those creditors who elected to take the fifteen per cent cash settlement.

Discord developed over the question whether the attorneys for the petitioning creditors were to be compensated for their services. Gill and the bankrupt filed a joint objection to the petition for the allowance of attorney's fees, and apparently as a result of this disagreement, the bankrupt failed to make the deposit necessary to fulfil the terms of the arrangement. Hence, on October 26, 1961, the referee entered an order dismissing the arrangement proceedings, adjudicating Tinney Produce a bankrupt, and ordering that bankruptcy be proceeded with, all as directed by 11 U.S.C.A. § 777 (1). The appellee was appointed re-

---

3. The agreement provided as follows:
"1. That upon demand he [Gill] will pay in cash to the Trustee appointed to receive the same such amounts as may be required to be paid to the unsecured creditors electing to accept or presumed to have elected to accept 10% of their claims under said Arrangement as therein provided, upon the condition that such payments shall be secured and agreed to be paid as hereinafter provided.
"2. That pending the consummation of said Arrangement, he will accept in pay-

ment of the secured indebtedness owing to him by the Debtor the net distributable earnings of the Debtor (as in said Arrangement defined) as the same accrue thereunder, and so long as such payments are so made will withhold the foreclosure of the liens held by him securing the same; provided, however, that such liens and indebtedness and any additions thereto shall be subject to renewal and extension by Debtor as hereinafter provided."

ceiver, and later trustee, of the bankrupt estate, no trustee having been appointed while the arrangement proceedings were pending.

In November 1961, with the trustee's approval, Gill agreed to make the rental payments necessary to keep the bankrupt's lease alive. He was therefore authorized by the referee to collect the rents from the subtenants of the bankrupt and apply these amounts to the installments which he had paid to the bankrupt's lessor, Houston Produce Terminal, Inc., to preserve the lease.[4] The referee's order expressly stated that it should "not in any manner prejudice the rights of Ned Gill or H. A. Phillips, Trustee in Bankruptcy, as such rights now exist prior to the entry of this Order." About a year later, the referee, upon application of the trustee, authorized Gill to collect the accounts receivable of the bankrupt, applying 75 per cent of the amount he collected to the reduction of his secured indebtedness and 25 per cent to the expense of collection.

Pursuant to an order of the referee, Gill filed his secured claims against the estate on December 11, 1961. All these claims were embodied in Proof of Claim No. 82, which asserted (1) a secured claim for $57,866.32, the amount due on the $200,000.00 note originally payable to the Bank of Texas and now owned by Gill; (2) a secured claim asserted by Gill by way of subrogation for $12,339.-57, an amount allegedly paid by Gill

to Houston Produce Terminal to satisfy an old indebtedness of the bankrupt for which it had executed a chattel mortgage as security; and (3) a first priority claim arising out of the payment of the rent to Houston Produce Terminal in the amount of $29,053.32. This latter claim was in effect an expansion of Proof of Claim No. 49, which had been filed during the arrangement proceedings.

The trustee filed a timely answer and counterclaim in which he asserted that in the four-month period immediately preceding the filing of the bankruptcy petition, Gill had received from the bankrupt payments totalling $20,500.00. In his counterclaim the trustee asked that these payments be "cancelled and set aside" as preferential transfers under § 60, 11 U.S.C.A. § 96, or as fraudulent conveyances under § 67, sub. d(2), 11 U.S.C.A. § 107, sub. d(2) and Articles 3996 and 3997, Vernon's Annotated Civil Statutes of Texas.[5] Gill filed a timely plea in which he objected to the summary jurisdiction of the referee to determine the counterclaim.[6]

After a hearing on the jurisdictional question, the referee found, on the basis of the facts outlined above, that Gill's numerous prior appearances in the bankruptcy court constituted an implied consent to the summary jurisdiction of the referee to determine the issues raised in the trustee's counterclaim and to grant any appropriate relief.[7] Also, the referee concluded that Gill was the *alter ego* of

---

4. Apparently, Gill was authorized to pay the rent installments because the trustee had insufficient funds available to make the payments but deemed it in the best interest of the creditors to preserve the lease as an asset of the bankrupt estate. However, the lease was subsequently ordered abandoned upon application of the trustee, and Gill acquiesced in this abandonment.

5. The trustee's counterclaim also asked for other relief, but these additional requests are not subject to dispute here.

6. Although Gill's plea objecting to the jurisdiction of the referee was not filed until October 23, 1962, long after the time fixed by Fed.R.Civ.P. 12, the trus-

tee had agreed not to object to a delayed filing. Therefore, the referee treated the plea as timely filed under § 2, sub. a (7) of the Bankruptcy Act, 11 U.S.C.A. § 11, sub. a (7), thus eliminating any question of consent by failure to object to jurisdiction.

7. Although the trustee's counterclaim does not contain a specific request that Gill be required to pay over the $20,500.00 in transfers which the trustee seeks to avoid, presumably he intends to enforce a decision in his favor by petitioning the bankruptcy court for a turnover order directed to Gill, thus invoking the summary powers of the bankruptcy court to the fullest possible extent.

the bankrupt corporation. This conclusion was predicated on the referee's finding that Gill, under the terms of the voting trust and, after May 31, 1961, as the sole shareholder of the bankrupt, "has been in a position to exercise complete control of Bankrupt" and that "Gill did, in fact, exercise that control." The District Court adopted all the findings and conclusions of the referee, and this interlocutory appeal followed.

■ Section 2, sub. a(7) of the Bankruptcy Act, 11 U.S.C.A. § 11, sub. a(7), contains a general grant of jurisdiction to the federal district courts, as courts of bankruptcy, to "cause the estates of bankrupts to be collected, reduced to money and distributed, *and determine controversies in relation thereto*, except as herein otherwise provided * * *." (emphasis supplied) These powers may be carried out in summary proceedings before the referee, in which parties are brought into court by an order to show cause and issues are resolved upon affidavits.[8] Congress, however, has created an exception to this broad jurisdictional grant by the provisions of § 23, sub. b, 11 U.S.C.A. § 46, sub. b, which provides: "Suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this Act had not been instituted, *unless by consent of the de-*

*fendant*, except as provided in sections 60, 67, and 70 of this Act." (emphasis supplied) Hence, an adverse claimant, under section 23, may by his actions manifest a consent to the determination of his claim by the bankruptcy court through summary proceedings before the referee, even though the nature of his claim is such that he has a right to insist that it be decided in a plenary suit.[9] Consent to summary jurisdiction may be express, as by stipulation, or it may be implied. A claimant may impliedly consent, for example, by failing to state his objection to the referee's jurisdiction within the time specified by law or rule of court.[10] The courts have also inferred consent from certain situations in which the claimant, by invoking the jurisdiction of the bankruptcy court, has manifested a willingness to have certain issues finally adjudicated by that court. On this latter basis, the referee in the instant case concluded that the appellant Gill consented to the exercise of the referee's summary powers to determine the question whether the $20,500.00 Gill had received was voidable by the trustee.

■ Perhaps it is appropriate to note at the outset that consent to summary jurisdiction is not lightly to be inferred. As this Court has emphasized before, the admittedly desirable end of expeditious administration of bankrupt estates should not be allowed effectively to eliminate the

---

**8.** See generally 2 Collier, Bankruptcy ¶ 23.02[2].

**9.** Section 60, sub. b, 11 U.S.C.A. § 96, sub. b, which relates to the trustee's power to avoid preferential transfers, provides:

"For the purpose of any recovery or avoidance under this section, *where plenary proceedings are necessary*, any State court which would have had jurisdiction if bankruptcy had not intervened and any court of bankruptcy shall have concurrent jurisdiction." (emphasis added)

Substantially identical provisions exist in § 67, sub. e, 11 U.S.C.A. § 107, sub. e, and § 70, sub. e (3), 11 U.S.C.A. § 110, sub. e (3). Hence, Congress has permitted the trustee to institute plenary suits in any federal district court, even

though the bankrupt could not have brought the suit in that court. Some question has been raised as to whether the language which is italicized above requires that all suits brought under these sections be plenary in nature. However, this Court adheres to the interpretation set forth in B. F. Avery & Sons Co. v. Davis, 192 F.2d 255, 258 (5 Cir. 1951):

"We take it that the words 'where plenary proceedings are necessary' do not mean that plenary proceedings are necessary in all such cases; but 'where' means 'if', and implies there may be cases in which summary proceedings in bankruptcy are proper."

**10.** See 11 U.S.C.A. § 11, sub. a (7); Nicholas v. Peter Pan Snack Shop, Inc., (5 Cir. 1958) 256 F.2d 349.

protection afforded litigants by the traditional safeguards of a plenary suit, with its right to trial by jury and cross-examination of witnesses. See, e. g., Fox Jewelry Co. v. Lee, 264 F.2d 720 (5 Cir. 1959); Cf. Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Therefore, we approach the issue of consent to summary jurisdiction with a certain degree of circumspection.

■■ We do not view any of Gill's appearances in the bankruptcy proceedings as evidencing a willingness on his part that the bankruptcy court decide the preference and fraudulent conveyance issues in summary proceedings. Consent should be inferred only from a clear manifestation by the adverse party that he is submitting a particular issue to the summary jurisdiction of the referee for determination. Gill's contract with the bankrupt to deposit the amount necessary to fulfil the proposed arrangement and his voting a number of claims in favor of the arrangement, either himself or by his attorney, were all directed to the end of effectuating a settlement with the creditors in which the company would be retained as an operating entity. Gill had invested heavily in the bankrupt, and, understandably, wished to salvage the company if possible. In the absence of any evidence that Gill manipulated the arrangement proceedings to the detriment of the unsecured creditors, we find no basis for an implied consent to summary jurisdiction. Furthermore, Gill, as the moving force behind the arrangement and as an unsecured creditor, had the right to object to the payment of attorneys' fees, and his joint appearance for the purpose of contesting the petition of the attorneys should not be deemed a consent to the referee's jurisdiction, at least where there is no evidence in the record that his action was motivated by bad faith.

Nor should consent be inferred from the fact that Gill agreed to make the installment payments necessary to preserve the bankrupt's lease or that he acquiesced in its subsequent abandonment. Both of these orders were initiated by the trustee and the first expressly stipulates that neither Gill nor the trustee will be prejudiced thereby. Likewise, the order authorizing Gill to collect the accounts receivable of the bankrupt and to apply them to his secured claims was entered upon application of the trustee. These accounts had been assigned to Gill previously by the Bank of Texas when he purchased the $200,000.00 note, and the trustee's order merely authorized him to realize on his security interest. It is not significant that these orders were prepared by Gill's attorneys.

The referee also based his finding of consent on the fact that Gill filed Proofs of Claim Nos. 48 and 49 in the arrangement proceeding and Proof of Claim No. 82 in the subsequent bankruptcy proceeding. To hold that the mere filing of a proof of claim constitutes consent to the jurisdiction of the referee to make a summary determination with respect to an unrelated transaction is directly contrary to this Court's holding in B. F. Avery & Sons Co. v. Davis, (5 Cir. 1951) 192 F.2d 255. In that case the claimant filed a proof of claim in the bankruptcy proceedings for the balance due on certain farm machinery which the bankrupt had purchased on open account. The same claimant, however, had sold the bankrupt other farm machinery pursuant to a Dealers' Contract under which it asserted the right to repossess the machinery if the bankrupt defaulted in his payments. Within the four-month period preceding bankruptcy, the bankrupt defaulted and the claimant repossessed certain machinery. The trustee, invoking § 57, sub. g of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. g, asked the trustee to disallow the open account claim unless the claimant surrendered the machinery he had repossessed. This request was premised on the theory that the repossession constituted a voidable preference. This Court held that, since consent could not be inferred from the mere filing of the proof of claim, a plenary suit was necessary unless, upon a preliminary inquiry, the referee found that the claim-

ant's possession of the farm machinery was merely colorable.

In the instant case, Proof of Claim No. 49 was a priority claim based upon amounts paid by Gill to preserve the bankrupt's lease. Proof of Claim No. 82 contained three parts: a secured claim for the amount due on the $200,000.00 note which Gill had purchased from the Bank of Texas, a secured claim for an old indebtedness which Gill had paid to Houston Produce Terminal, and an expansion of Proof of Claim No. 49. Clearly, none of these claims were predicated on the same transaction as the alleged voidable transfers, and Avery, therefore, is controlling.

However, Gill also filed Proof of Claim No. 48 in the arrangement proceedings. This claim asserted that a $12,500.00 balance was due on the $50,000.00 unsecured note of the bankrupt. The $20,500.00 which the trustee seeks to avoid in his counterclaim consisted of payments made in partial satisfaction of this same loan. Hence, the two claims are likely based on the same financial transaction [11] and cannot be disposed of simply by reference to Avery.

Much controversy has centered around the question to what extent the filing of a proof of claim constitutes consent to the summary jurisdiction of the bankruptcy court.[12] Most of the circuits have now adopted the proposition that filing a proof of claim is consent to the summary adjudication of all controversies arising out of the same transaction which is the basis of the creditor's claim.[13] Only one court has extended this rule to include a counterclaim by the trustee which arose out of a separate and distinct transaction.[14] The position of the Fifth Circuit since B. F. Avery & Sons Co. v. Davis, supra, is not clear where the claim and counterclaim are based on the same transaction. Although the claim and counterclaim in Avery arose out of unrelated transactions, that distinction was not the articulated rationale of the decision.[15]

In the instant case, we have before us a somewhat peculiar situation. Gill filed Proof of Claim No. 48 in the arrangement proceeding. This claim was premised on the $50,000.00 unsecured note that he held and it appears from the record that the alleged preferences or fraudulent conveyances which the trustee sets forth in his answer and counterclaim were partial repayments of that same loan. Of course, at this time Gill knew that ultimately the company might be adjudicated a bankrupt, and that, if this occurred, the payments he had already received on that note would be subject to avoidance by the trustee. Nevertheless, at the time he filed the claim, the issue of whether he had received a preference or fraudulent conveyance could not arise,

---

11. The referee made no finding that Proof of Claim No. 48 and the trustee's counterclaim arose out of the same transaction.

12. See generally 49 Va.L.Rev. 571 (1963).

13. See Peters v. Lines (9 Cir. 1960) 275 F.2d 919; Continental Cas. Co. v. White (4 Cir. 1959) 269 F.2d 213; In re Majestic Radio & Television Corp. (7 Cir. 1955) 227 F.2d 152; In re Solar Mfg. Corp. (3 Cir. 1952) 200 F.2d 327 (Chapter X proceedings); In the Matter of Petroleum Conversion Corp. (3 Cir. 1962) 196 F.2d 728, affirming 99 F.Supp. 899 (D.Del.1951); In re Nathan (S.D. Calif.1951) 98 F.Supp. 686; Columbia Foundry Co. v. Lochner (4 Cir. 1950) 179 F.2d 630, 14 A.L.R.2d 1349; Chase Nat'l. Bank v. Lyford (2 Cir. 1945) 147 F.2d 273 (railroad reorganization proceedings); Floro Realty & Inv. Co. v. Steem Elec. Corp. (8 Cir. 1942) 128 F. 2d 338; Florance v. Kresge (4 Cir. 1938) 93 F.2d 784.

14. Inter-State Nat'l. Bank v. Luther (10 Cir. 1955) 221 F.2d 382. In this case, heard en banc by the court, there was a strong dissent by Judge Phillips, joined by Judge Pickett, who would have limited consent to situations in which the claim and counterclaim arose out of the same transaction.

15. Two district courts have followed Avery, but in both of those cases the claim and counterclaim arose out of different transactions. See In re Houston Seed Co. (N.D.Ala.1954) 122 F.Supp. 340; In re Tommie's Dine & Dance (N. D.Tex.1952) 102 F.Supp. 627.

since such transfers are not voidable in an arrangement proceeding. When bankruptcy was finally adjudicated and the arrangement proceedings were dismissed, the bankruptcy proceeding was deemed reinstated and was to be conducted as nearly as possible as if the Chapter XI proceedings had never been filed.[16] Thus, it would appear that proofs of claim which are filed in an arrangement proceeding must be treated as if they had been filed in the subsequent bankruptcy proceeding, unless, of course, they are withdrawn or otherwise disaffirmed.

The trustee, however, took no action against Gill with respect to the alleged preferences until after Gill filed the secured and priority claims which are embodied in Proof of Claim No. 82. In answer to *this claim,* the trustee, apparently pursuant to § 57, sub. g, asserted that the $20,500.00 that Gill had received as payments on the $50,000.00 unsecured loan were either preferences or fraudulent conveyances. Therefore, he prayed that the referee deny the proof of claim or, in the alternative, disallow it until Gill surrendered the allegedly voidable transfers. Clearly Avery controls as to the relief which the trustee requests in his answer, since the transactions on which the claim and answer are based, are different.

However, the trustee, in conjunction with his answer, filed a pleading which is styled "Counterclaim of H. A. Phillips, Trustee, Against Ned Gill." In it he asks, among other things not material here, that the allegedly voidable transfers to Gill be "cancelled and set aside." There is no indication in the record whether this counterclaim was intended as a set-off only to the secured and priority claims except that it was filed concurrently with the answer to those claims. The trustee makes no attempt to justify summary jurisdiction on the ground that the counterclaim and Proof of Claim No.

48, which was filed during the arrangement proceedings, arose out of the same transaction, and only the appellant's brief raises this point at all. In light of the ambiguous nature of the trustee's pleadings, the absence of any assertion by the trustee that the cause of action in his counterclaim arose out of the same transaction as Proof of Claim No. 48, the uncertainty as to the breadth of the Avery decision and the absence of argument as to its applicability, and the fact that Gill's Proof of Claim No. 48 was filed prior to the adjudication of bankruptcy, we do not feel justified in finding that Gill consented to the exercise of summary jurisdiction. However, we do not intend our decision in this case to be interpreted as either an acceptance or repudiation of the "same transaction" theory by this Circuit. We wish to reserve a decision on that question for a case that brings the issue squarely into focus.

We turn now to the referee's finding that Gill's control over the corporation was so complete that he was, in legal contemplation, the bankrupt's *alter ego.* Since the referee has summary jurisdiction over the bankrupt himself, it follows that his jurisdiction extends to any person or corporation who has so acted that it would be inequitable not to treat his affairs as those of the bankrupt. In concluding that Gill was the bankrupt's *alter ego,* the referee apparently relied upon Gill's powers under the voting trust, his ownership, after May 31, 1961, of all the capital stock of the bankrupt, and his activity in attempting to effect an arrangement with the bankrupt's unsecured creditors. There are a number of cases in which a referee's summary turnover order has been sustained by "piercing the corporate veil," but we have found no case in which there was not some evidence of an attempt to defraud the creditors of the bankrupt or otherwise manipulate the bankrupt's affairs to the creditors' detriment.[17] As this Court

---

16. See 11 U.S.C.A. § 778(1).

17. See, *e.g.,* South Falls Corp. v. Rochelle (5 Cir. 1964) 329 F.2d 611 (the evidence portrays "a picture of discriminate application of funds to the advantage of insiders."); In re Gillespie Tire Co. (W.D. S.C. 1942) 54 F.Supp. 336. On the

stated in Maule Industries, Inc. v. L. M. Gerstel (5 Cir.1956) 232 F.2d 294, 297:

"Courts are reluctant to pierce the corporate veil and destroy the important fiction under which so much of the business of the country is conducted, and will do so only under such compelling circumstances as require such action to avoid protecting fraud or defeating public or private rights."

In the instant case the referee found that Gill was in a position to control the bankrupt company and that he actually exercised that control. However, the mere existence and exercise of control over a bankrupt corporation is an insufficient warrant for destroying the corporate fiction and subjecting the dominant shareholder to the summary jurisdiction of the referee in the absence of at least some evidence of manipulation. The referee made no finding from which it could be inferred that it would be inequitable not to subject Gill to the bankruptcy court's summary jurisdiction. Indeed, the evidence before us is consistent with a good faith effort on the part of Gill to salvage the corporation and work out some sort of settlement with the corporation's unsecured creditors.[18] Moreover, although Gill may have been in a position to exercise control over the corporation under the terms of the voting trust when the allegedly voidable transfers were made, he had clearly exercised no control at that time.

The case of In re Gillespie Tire Co., (W.D.S.C.1942) 54 F.Supp. 336, on which the trustee relies heavily, is factually distinguishable from the case at bar. There, the owner of 98% of the bankrupt's capital stock had dealt with the corporation's assets to the detriment of its largest unsecured creditor, primarily by making transfers to her personal account. On the facts, the court was convinced that "in these transactions a legal fraud was committed against the interest of certain creditors for which Mrs. Gillespie should be liable." 54 F.Supp. at 337. In the case at bar, the evidence in the record does not convince us that Gill's control of the corporation was exercised in such a manner that he should be treated as the bankrupt and subjected to the summary jurisdiction of the bankruptcy referee for all purposes.

In view of our disposition of the consent issue, the judgment of the District Court and the order of the referee are reversed and the cause is remanded to the District Court for further proceedings not inconsistent with this opinion. We note in this connection that the referee expressly stated in his decision that he had not inquired into the question of whether Gill's position with respect to the allegedly voidable transfers was adverse, substantial, and asserted in good faith or whether it was merely colorable. This line of inquiry is still open, and, if, upon hearing, the referee determines that Gill's claim is colorable only, it is possible that summary jurisdiction can be sustained. We intimate no opinion on this question.

Reversed and remanded.

other hand, this court has refused to pierce the corporate veil where something equivalent to fraud was not shown. See Maule Industries, Inc. v. L. M. Gerstel (5 Cir. 1956) 232 F.2d 294.

18. The fact, standing alone, that under the proposed arrangement, Gill's secured claims were to be paid in full while those of some unsecured creditors would not be fully satisfied, does not constitute evidence from which an improper purpose might be inferred. The Bankruptcy Act itself grants secured creditors a preferred position. Furthermore, under the arrangement proposal, the unsecured creditors could elect to have their claims fully satisfied out of the net distributable earnings of the company over a period of time.