In the Matter of Ernest Fredrick **GARNER, Bankrupt.**

**GENERAL FINANCE CORPORATION,**
Appellant,

v.

**Ernest Fredrick GARNER, Appellee.**

No. 75–4067.

United States Court of Appeals,
Fifth Circuit.

July 29, 1977.

---

James A. Elkins, Jr., Columbus, Ga., for appellant.

Michael P. Fox, Columbus, Ga., for appellee.

Before AINSWORTH and MORGAN, Circuit Judges, and LYNNE, District Judge.*

LEWIS R. MORGAN, Circuit Judge:

This appeal presents questions about the disclosure requirements of the federal Truth-in-Lending Act,[1] about the powers of a bankruptcy judge under Chapter XIII (the Wage Earner provisions) of the Bankruptcy Act,[2] and about the interface between these two statutory schemes.

## I. FACTS

In 1974, appellee Ernest Garner purchased a car from Cantrell's Auto Sales in Columbus, Georgia. Garner signed a conditional sales contract granting the seller a security interest in the car. The contract required Garner to make 30 monthly payments of $86.19 each for a total of $2,585.70. In the same document, Cantrell's Auto Sales assigned the contract to appellant General Finance Corp.

The record indicates that Garner made 11 monthly payments on the car. On February 11, 1975, after Garner made the payment that was due for that month, he filed in the Middle District of Georgia a petition for relief under Chapter XIII of the Bankruptcy Act. Garner proposed to pay his creditors all that he owed them through the extension mechanism provided by Chapter XIII.[3] Garner's plan called for a monthly payment to General Finance in the amount of $47.88.

General Finance rejected the plan.[4] It filed a reclamation petition seeking possession of the car.[5] Garner answered the petition, alleging *inter alia* that the conditional sales contract violated the federal Truth-in-Lending Act. The bankruptcy judge agreed with Garner that the contract violated the Truth-in-Lending Act. The court concluded that Garner was entitled to a statutory penalty of $1,000.00[6] and to an attorney's fee of $150.00.[7] The court, however, did not order General Finance to pay the penalty directly:

The proof of claim filed by General Finance Corporation is in the amount of $1,637.61. We shall apply the $1,000.00 to this claim and allow the claim in the amount of $637.61. This would appear preferable to requiring General Finance Corporation to pay the sum of $1,000.00 to the debtor and increasing the payments under the plan to General Finance Corp. to $86.19 per month. The Chapter XIII Trustee should be instructed to pay to General Finance Corp. the sum of $47.88 per month as proposed in the original plan until General Finance Corporation has received the total of $637.61.

Record at 29.

General Finance appealed to the district court. That court upheld the bankruptcy judge's conclusion that the conditional sales contract was violative of the Truth-in-

---

*  Senior District Judge of the Northern District of Alabama, sitting by designation.

1.  15 U.S.C. § 1601 et seq.

2.  11 U.S.C. § 1001 et seq.

3.  As the Supreme Court has noted,

    under an extension plan, the wage earner who makes the required payments will have paid his debts in full and will not need a discharge, even though the Act provides for a formal one. § 660.

*Perry v. Commerce Loan Co.*, 383 U.S. 392, 398–99, 86 S.Ct. 852, 856, 15 L.Ed.2d 827 (1966).

4.  11 U.S.C. § 1052; Fed.R.Bankr.Pro. 13–202.

5.  *See Thompson v. Ford Motor Credit Co.*, 475 F.2d 1217 (5th Cir. 1973); *Terry v. Colonial Stores Employee's Credit Union*, 411 F.2d 553 (5th Cir. 1969).

6.  15 U.S.C. § 1640.

7.  *Id.*

Lending Act.[8] The court also approved the remedy fashioned by the bankruptcy judge:

> [O]n the surface it might appear that the effect of this reduction in monthly payments is a forcing of the wage earner plan upon a secured creditor. However, in actuality this is not so because, as a practical matter, being paid the amount of $47.88 per month to be credited against the indebtedness of $637.61 General Finance Corporation will have its total indebtedness paid in approximately the same time in which the originally claimed indebtedness would have been paid if the contract payment had been made each month, and they, therefore, are not adversely affected by the plan.

Record at 88.

General Finance raises two issues here. First, it challenges the conclusion that the contract violated the Truth-in-Lending Act. Second, it contends that the reduction in the monthly payments "materially and adversely" affected it, entitling it to possession of the collateral.

## II.  JURISDICTION OF THE BANKRUPTCY COURT OVER A TRUTH-IN-LENDING COUNTERCLAIM

■ General Finance did not raise to the bankruptcy judge or to the district court and does not raise here any objection to the jurisdiction of the bankruptcy judge to hear Garner's Truth-in-Lending counterclaim to the reclamation petition. The Truth-in-Lending Act prohibits any set-off of its statutory penalty against a contractual obligation owed the creditor unless the Truth-in-Lending claim first is adjudicated before a court of competent jurisdiction. 15 U.S.C. § 1640(h). Moreover, to the extent that the *subject matter* jurisdiction of the bankruptcy court is at stake, we must make our own jurisdictional inquiry despite the parties' willingness to have the Truth-in-Lending issue heard by that court. *See, e. g., Clark*

*v. Paul Gray, Inc.*, 306 U.S. 583, 588, 59 S.Ct. 744, 83 L.Ed. 1001 (1939).

■ Although General Finance's failure to object at any point to the bankruptcy judge's exercise of jurisdiction does not absolve us of the obligation to inquire into the basis of the jurisdiction, the silence does settle the jurisdictional question here. Because the Truth-in-Lending claim arose as a controversy connected to the Chapter XIII proceeding in that it was interposed against General Finance's reclamation petition and served to challenge the amount of General Finance's claim, jurisdiction over the Truth-in-Lending claim fell to the bankruptcy judge by virtue of General Finance's consent.

Before going further, we note the observation of one commentator in this area:

> The fact that a federal court dealing with a matter of bankruptcy . . . may acquire jurisdiction over the subject matter of a controversy by consent probably produces a mild shock upon a first encounter with §§ 2a(7) and 23b [the jurisdictional grants in the Bankruptcy Act]. Both sections speak in terms of the power of the court based upon consent by an adverse party. It is not surprising, however, to discover that these sections present almost unparalleled difficulties of jurisdictional analysis and raise problems of as fundamental import as do the so-called 'grand clauses' of the Constitution.

Ferguson, *The Consensual Basis of Subject-Matter Jurisdiction in Matters of Bankruptcy: Fact and Fiction*, 14 Rutgers L.Rev. 491, 495 (1960). Resolution of the jurisdictional issue in the instant case does not require a full-blown treatment of all of these "almost unparalleled difficulties," and our discussion below should not be taken as an attempt at the definitive. We have attempted to clear only the straight path to an answer here, and we have left the many side paths and thickets for other days.

8. The bankruptcy judge found three violations of the Truth-in-Lending Act, but the district court found only the violation that we discuss *infra*. Garner brought no cross-appeal chal-

lenging the district court's narrower view of liability; therefore, we need not reach the other two purported violations of the Act.

Section 2 of the Bankruptcy Act, the basic jurisdictional provision, grants sweeping powers to the courts of bankruptcy. "Courts of bankruptcy" are defined in section 1 of the Act as the federal district courts, and "court" is defined there to mean "the judge or the referee of the court of bankruptcy." 11 U.S.C. § 1. The most sweeping of the section 2 jurisdictional grants is section 2(a)(7):

(a) The courts of the United States hereinbefore defined as courts of bankruptcy are hereby created courts of bankruptcy and are hereby invested within their respective territorial limits as now established or as they may be hereafter changed, with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this title, in vacation, in chambers, and during their respective terms, as they are now or may be hereafter held, to—

.    .    .    .    .

(7) Cause the estates of bankrupts to be collected, reduced to money, and distributed, *and determine controversies in relation thereto*, except as herein otherwise provided  .  .  .  and where *in a controversy arising in a proceeding under this title* an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction

.  .  . .

11 U.S.C. § 11(a)(7) (emphasis added). Were section 2 the only section of the Act touching jurisdiction, the courts of bankruptcy would be empowered to hear many controversies that, absent bankruptcy, would be cognizable only in state courts, and in fact, prior to 1898, the Bankruptcy Act was so structured. *See Schumacher v. Beeler*, 293 U.S. 367, 371–72, 55 S.Ct. 230, 79 L.Ed. 433 (1934). In 1898, Congress enacted section 23 of the Act:

(a) The United States district courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings under this title, between receivers and trustees as such and adverse claimants, concerning the property acquired or claimed by the receivers or trustees, in the same manner and to the same extent as though such proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants.

(b) Suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this title had not been instituted, unless by consent of the defendant except as provided in sections 96, 107, and 110 of this title.

11 U.S.C. § 46. The *Schumacher* Court analyzed section 23 this way:

In enacting § 23, it was clearly the intent of the Congress that the federal courts should not have the unrestricted jurisdiction of suits between trustees in bankruptcy and adverse claimants which these courts had exercised under the broad provisions of § 2 of the Act of 1867. The purpose was to leave such controversies to be heard and determined for the most part in the state courts 'to the greater economy and convenience of litigants and witnesses.' But no reason appeared for a denial of jurisdiction to the federal court if the defendant, the adverse claimant, consented to be sued in that court. The Congress, by virtue of its constitutional authority over bankruptcies, could confer or withhold jurisdiction to entertain such suits and could prescribe the conditions upon which the federal courts should have jurisdiction.

293 U.S. at 374, 55 S.Ct. at 233.

Thus, what section 2(a)(7) grants, section 23 in part takes back, with the crucial exception that the adverse party may *consent* to federal jurisdiction. Furthermore, by a 1952 amendment, section 2(a)(7) provides that a person otherwise entitled to a plenary proceeding (that is, a regular civil pro-

ceeding) in the district court may, by failing to object, submit to the summary made of procedure used by the bankruptcy judge.

The jurisdictional limitation imposed by section 23 actually does not concern us here, because Congress has provided that Truth-in-Lending claims may be heard by the federal courts. 15 U.S.C. § 1640(e). Thus, the only hurdle to the jurisdiction of the bankruptcy judge here might have been General Finance's insistence on a plenary suit in the district court. But, as we have noted, General Finance interposed no objection to the summary procedure of the bankruptcy judge, and, by the express language of section 2(a)(7), the silence operated as consent to that summary jurisdiction.[9]

■ What we have said thus far does not, of course, mean that a bankruptcy court always is competent to hear a Truth-in-Lending claim so long as the parties consent. The Act limits the jurisdiction to controversies related to the bankruptcy proceeding, or, in this case, the Chapter XIII proceeding,[10] and even if the Act were not so limited, the constitutional authority pursuant to which the Act was passed[11] imposes obvious limits on the contexts in which a bankruptcy judge may hear a Truth-in-Lending claim.[12] Here the Truth-in-Lending claim has a sufficient nexus with the Chapter XIII proceeding to come within the statutory and constitutional limits. The

claim was asserted in answer and as a counterclaim to a reclamation petition filed by a secured creditor. The source of the alleged violation was the same contract that was the basis for the reclamation petition. And the bankruptcy judge used the statutory penalty to reduce the amount of the creditor's claim.

Thus, we hold that the bankruptcy judge had jurisdiction to adjudicate the Truth-in-Lending claim.

## III. THE TRUTH–IN–LENDING VIOLATION

The district court approved the bankruptcy judge's conclusion that the conditional sales contract violated the disclosure provisions of the Truth-in-Lending Act and the Federal Reserve Board's regulations thereunder (Regulation Z), because the disclosure statement on the contract did not call attention to a provision in small type on the reverse side of the document dealing with a security interest in future indebtedness. Record at 86–87. The future indebtedness provision states:

The security interest aforesaid shall, in addition to securing all presently existing debts and liabilities, secure all future advances made by the Seller to or for the account of the Buyer, including advances for loans, taxes, levies, insurance, repairs to or maintenance of the collateral and all

---

**9.** In *Gill v. Phillips*, 337 F.2d 258 (5th Cir. 1974), we noted that

[a] claimant may impliedly consent . . . by failing to state his objection to the referee's jurisdiction within the time specified by law or rule of court.

*Id.* at 262 (citing § 2(a)(7) in a footnote). *See Phelps v. United States*, 421 U.S. 330, 336 n. 6, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975); *In re Airmotive Suppliers, Inc.*, 519 F.2d 1102 (5th Cir. 1975); *In re Dunne*, 407 F.Supp. 308, 310 (D.R.I.1976) (Truth-in-Lending counterclaim; failure to object); *In re Warren*, 387 F.Supp. 1395, 1400–03 (S.D.Ohio 1975) (Truth-in-Lending claim; failure to object); Fed.R.Bankr.Pro. 915(a); 2 Collier on Bankruptcy ¶ 23.08, at 535 (1975).

**10.** Chapter XIII incorporates the provisions of Chapters 1 to 7 of the Bankruptcy Act, insofar as those provisions are not inconsistent with the provisions of Chapter XIII. 11 U.S.C. § 1002.

**11.** Art. 1, § 8, cl. 4 of the Constitution empowers Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States . . . ."

**12.** Collier puts it this way:

[A]lthough consent under § 23b [and presumably under § 2(a)(7)] may confer jurisdiction over the subject matter in the federal courts, it must do so *within the limitations of the Bankruptcy Act.* Thus consent cannot operate to confer jurisdiction on the bankruptcy court as to a claim asserted by strangers to the proceedings over a matter in no way connected with the administration or distribution of the bankrupt estate.

2 Collier on Bankruptcy § 23.08, at 533–34 n. 7 (1975) (emphasis in original).

reasonable costs and expenses incurred in the collection of any such indebtedness. Record at 16.

The Truth-in-Lending Act requires the creditor [13] in the kind of transaction involved here to disclose

[a] description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates.

15 U.S.C. § 1638(a)(10). The Federal Reserve Board's regulations require

[a] description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates or, if such property is not identifiable, an explanation of the manner in which the creditor retains or may acquire a security interest in such property which the creditor is unable to identify. . . . If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired.

12 C.F.R. § 226.8(b)(5).

The future indebtedness term on the reverse side of the conditional sales contract here seems clearly to fall within the language both of the Act and of Regulation Z. General Finance offers three contentions in opposition to this conclusion.

■ First, General Finance seeks the protection of 12 C.F.R. § 226.8(j), which states in relevant part:

Any increase in an existing obligation to reimburse the creditor for undertaking the customer's obligation in perfecting, protecting or preserving the security shall not be considered a new transaction subject to this part.

General Finance's position seems to be that the future indebtedness term on the back of the contract served only to state ahead of time that the car would secure any sums expended by General Finance to protect the collateral and that, since the Act does not require disclosure even when such advances are made, disclosure *a fortiori* is not required prior to the expending of the sums. Manifestly, however, the dragnet provision in the instant contract reaches well beyond sums spent to protect the collateral. The contract provides that the automobile shall secure

*all future advances* made by the Seller to or for the account of the Buyer, including advances for *loans*, taxes, levies, insurance, repairs, to or maintenance of the collateral . . . .

Record at 9 (emphasis added). Thus, we think the provision is drawn too broadly to come within any protection § 228.8(j) might otherwise have provided.

■ Second, General Finance contends that the spirit of the Truth-in-Lending Act will be served if disclosure is made at the time of any future advances, the theory being that Garner could then choose to go elsewhere for credit. This notion has been rejected by the Federal Reserve Board. Section 226.8(b)(5), set out *supra*, provides in part that

[i]f after-acquired property will be subject to the security interest, or *if other or future indebtedness* is or may be secured by any such property, *this fact shall be clearly set forth* in conjunction with the description or identification of the type of security interest held, retained or acquired.

While this language is not without ambiguity, as we shall discuss *infra*, it is at least clear that the creditor may not wait until the future transaction to tell the debtor about the future indebtedness provision. We think this is consistent with the Congressional purpose to

---

13. General Finance does not argue that it is not a creditor within the meaning of the Truth-in-Lending Act.

assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.

15 U.S.C. § 1601. The implication of General Finance's argument is that it should be of no moment to the potential borrower that he is binding the collateral to cover any future debts owed to the creditor. We think, on the contrary, that Congress meant for the potential debtor to have such information when deciding whether he ought to deal with a particular lender.

■ Third, General Finance contends that a security interest covering future indebtedness need be disclosed only when the interest covers after-acquired property. The argument is based on a reading of the somewhat ambiguous portion of 12 C.F.R. § 226.8(b)(5) set out *supra*. General Finance argues that the word "such" appearing in the quoted part of the regulation has as its antecedent "after-acquired" property, so that the regulation does not cover a future indebtedness provision binding existing collateral.

We reject this argument. First, the fact that the Federal Reserve Board may have singled out after-acquired property provisions for special treatment does not mean that future indebtedness provisions covering existing collateral are exempt from the disclosure requirement. The Board may have concluded simply that such terms respecting existing collateral so obviously fall within the language of the Act and regulations that explicit treatment is not necessary. Second, we perceive no policy reason why future indebtedness terms covering after-acquired property should be subject to the disclosure requirement, while such terms covering existing collateral may be couched in small type on the back of a document. Finally, we have stated in another case involving General Finance, *Pollock v. General Finance Corp.*, 552 F.2d 1142 (5th Cir. 1977) (on petition for rehearing), that the word "such" in the regulation does not refer only to after-acquired property, but instead has as its antecedent "property

to which the security interest relates," as those words appear in the first sentence of the regulation. *Id.* at 1145.

The bankruptcy judge and the district court held correctly that the conditional sales contract transgressed the disclosure imperative of the Truth-in-Lending Act.

## IV. REDUCTION OF THE MONTHLY PAYMENTS

General Finance argues finally that, as a secured creditor, it was entitled to monthly payments from Garner in the full amount called for by the contract. Because the Chapter XIII plan confirmed by the bankruptcy judge provided for lesser payments, General Finance contends it was entitled to possession of the collateral. We reject the argument.

### A. The Secured Creditor's Preferred Position in Chapter XIII Proceedings

It is true that a secured creditor "dealt with" by a Chapter XIII plan may decline to participate in it and may seek his collateral. 11 U.S.C. § 1052. The question is whether General Finance was "dealt with" by the Garner plan within the meaning of the Act.

The Act does not define "dealt with" as the term is used in section 1052, but this court in the past has indicated that "dealt with" is synonymous with "affected," another term used in the section. *See Terry v. Colonial Stores Employee's Credit Union*, 411 F.2d 553 (5th Cir. 1969). The Act does define "affected":

A creditor shall be deemed to be 'affected' by a plan only if his interest shall be materially and adversely affected thereby. . . .

11 U.S.C. § 1007. We must determine, then, whether the Garner plan materially and adversely affected General Finance's interest. General Finance contends its interest was materially and adversely affected because it was forced to accept less than the full contract payment and was also barred from reclaiming the collateral. General Finance cites as authority for the proposition our decision in the *Terry* case *supra*.

### B. *Terry and Thompson*

In *Terry*, the Chapter XIII debtor's credit union, which had lent the debtor money for an automobile purchase, was allocated less than the contract payment in the Chapter XIII plan. The Bankruptcy judge denied the credit union's petition for reclamation. The debtor defended this to us on the basis that

> the bankruptcy court may modify the contractual interests of secured creditors in Chapter XIII proceedings, where the inconvenience to the creditor is slight as compared to the beneficial results to the wage earner.

411 F.2d at 554. We found the argument "wholly unpersuasive." *Id.* We held that the creditor was materially and adversely affected, affirming the district court's decision to that effect.

In *Thompson v. Ford Motor Credit Co.*, 475 F.2d 1217 (5th Cir. 1973), a case not cited by General Finance, we discussed a bankruptcy judge's discretionary power to deny reclamation when a secured creditor who has rejected a Chapter XIII plan seeks to repossess the collateral from a defaulting debtor. In *Thompson*, the debtor had fallen behind on the payments due a secured creditor, triggering the creditor's filing of the reclamation petition. The Chapter XIII plan under which the payments were being made provided for payments at the contract rate.

We measured the correctness of the bankruptcy judge's decision to deny reclamation by four criteria:

> (1) General equitable considerations, including the debtor's good faith and ability to pay, should favor restraining foreclosure. (2) The injunction against foreclosure must be necessary to preserve the debtor's estate or carry out the Chapter XIII plan. (3) The injunction must not impair the security of the lien. (4) The owner of the secured indebtedness must not be required to accept less than full periodic payments specified in the contract.

475 F.2d at 1218–19.

■ The fourth criterion in *Thompson* and the decision in *Terry* on first reading might seem applicable here, but we conclude that neither of those cases controls this one. In each of those cases, the court's analysis was predicated on an assumption that the contract claim of the creditor accurately reflected the creditor's "interest," *see* 11 U.S.C. § 1007, so that any reduction in the monthly payment called for by the contract would "materially and adversely" affect that interest. Here, General Finance's contract claim does not accurately reflect General Finance's "interest." The balance sheet also includes a $1,000.00 credit for Garner flowing from the Truth-in-Lending claim. Taking account of this, the bankruptcy judge reduced the amount of the monthly payments. As a result, General Finance still will be paid all the money actually owed it by Garner in substantially less time than would have been the case had the amount owed and the monthly payments been at the levels called for by the conditional sales contract.[14] Under these circumstances, we cannot say that in any realistic, practical sense General Finance was materially and adversely affected by the Chapter XIII plan. Any adverse effect flowed from the Truth-in-Lending violation. We think the action taken by the bankruptcy judge comports with the language and purpose of Chapter XIII and is consistent with the concept included in the Bankruptcy Act that

> [i]n all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

Bankruptcy Act § 68, 11 U.S.C. § 108.

AFFIRMED.

---

14. In fact, Garner's counsel reported at oral argument that the full amount of General Finance's claim, as reduced by the Truth-in-Lending claim, has been paid to General Finance.