RECONSTRUCTION FINANCE COR-
PORATION, Appellant,

v.

RIVERVIEW STATE BANK, a Cor-
poration, Appellee.

No. 4907.

United States Court of Appeals
Tenth Circuit.

Nov. 23, 1954.

Rehearing Denied Jan. 11, 1955.

Inghram D. Hook, Kansas City, Mo., for appellant.

T. M. Lillard, Topeka, Kan., and N. E. Snyder, Kansas City, Kan., for appellee.

Before HUXMAN and PICKETT, Circuit Judges, and RITTER, District Judge.

PICKETT, Circuit Judge.

This is an appeal from a judgment of the District Court of Kansas where it was determined in a bankruptcy proceeding that the Reconstruction Finance Corporation was liable to the Riverview State Bank of Kansas City, Kansas, under a participation agreement entered into between those parties. On May 11, 1951, National Petroleum Reserve Corporation,[1] formerly H. A. Hershfield and Company, a New Mexico corporation engaged in the business of drilling for oil on leases in different counties in Kansas and in producing and selling the oil produced, sought reorganization by filing a petition under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. The bank filed a proof of claim in that proceeding which set forth that the debtor owed the bank the sum of $139,542.35, and that $124,544.70 of that amount represented the balance due on a secured obligation. The claim, as amended, alleged that, "Part of the original written instruments upon which this claim is based have been delivered to the Reconstruction Finance Corporation of the United States under the terms of a 'Participation Agreement' between it

1. Reconstruction Finance Corporation will be referred to herein as "RFC" and Riverview State Bank of Kansas City, Kan- sas, as "bank". The bankrupt will be re- ferred to as the "debtor".

and Riverview State Bank, whereby Reconstruction Finance Corporation contracted to purchase 75% of the loan". It was also alleged that the RFC "has stated that it would purchase its seventy-five percent participation in the loan referred to in paragraphs 2 and 8 on a certain condition which has been complied with; but it has not yet completed such purchase, so this claim is made also on behalf of the Reconstruction Finance Corporation, as its interest may appear."

Upon the bank's motion, the Referee ordered the RFC to appear and show cause why it should not approve or disapprove any proposed plan of reorganization submitted by the debtor for the reasons set out in the proof of claims.[2] The RFC answered and denied that it had any interest in the proceedings as shown by the claim. With its answer, it filed a cross-petition in the nature of a declaratory judgment action in which it alleged the facts pertaining to the bank's loan to the debtor and the execution of the seventy-five percent "Blanket Participation Agreement", a copy of which was attached to the cross-petition. The cross-petition alleged that under certain terms and conditions set forth in the Agreement the RFC "agreed to and would purchase a participating interest in loans made by the bank (not in excess of $250,000), to the extent of seventy-five percent (75%) of any new loan which might be thereafter made by said bank." The RFC further alleged that the bank claimed that the loans made to the debtor were covered by the Agreement; and that the bank has demanded that the RFC purchase seventy-five percent of the loan balance. The RFC denied that it was liable for the purchase of any interest in the loan and alleged facts to show that the bank had failed to comply with the conditions of the Agreement which relieved it from liability thereon. The cross-petition prayed that the court "Hear and determine, declare and adjudicate the respective rights of the said Riverview State Bank and it, under the provisions and terms of said agreement, and under the facts herein, and for such other and further reliefs, judgments and decrees as shall be just and proper."

After a full hearing, the Referee found that the bankruptcy court had jurisdiction under Section 23, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 46, sub. b;[3] that the RFC in consideration of a fee[4] to be paid by the bank agreed to participate in loans made by the bank up to seventy-five percent thereof, not to exceed $250,000; that the bank had substantially complied with the requirements of the Participation Agreement; and that the RFC was bound to participate in the loan to the extent of seventy-five percent thereof.[5] On peti-

---

2. The debtor failed to propose a plan acceptable to its creditors and was adjudicated a bankrupt on March 27, 1951.

3. This section provides:
   "Suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this title had not been instituted, unless by consent of the defendant, except as provided in sections 96, 107, and 110 of this title."

4. Paragraph 10 of the Agreement provided:
   "Participation Charge. Within ten days after being billed therefor, Bank shall pay to RFC quarterly, for the period ending on June 30, 1945, and for each quarterly period thereafter, a participation charge computed at the rate of three-fourths of one per cent per annum where the Designated Percentage exceeds fifty (50) per cent, and otherwise at the rate of one-half of one per cent per annum, of the Designated Percentage of the unpaid principal balances of such loans on which disbursements have been made."

5. The Judgment Order of the Referee contained these provisions:
   "It is Further Considered, Ordered and Adjudged that the respective rights and legal relations of R.S.B. and R.F.C. as to all issues arising on the pleadings of the said parties herein, are declared, determined and adjudged as follows:

tion to review, the District Court adopted the findings and order of the Referee.

The RFC contends that the bankruptcy court was without jurisdiction to construe the Participation Agreement and establish the relative rights of the parties therein. It argues that the bankruptcy court was wholly without jurisdiction over the subject matter; that jurisdiction of the subject matter could not be waived by act of the parties; and that it was subject to challenge at any time. It urges that the RFC had neither the right nor the duty to participate in the bankruptcy proceedings under any color of claim; that the RFC was not a creditor and had no right to object or approve a proposed plan; that the claim was entirely that of the bank; and that the bank's right, if any, under the contract was against the RFC apart from the bankruptcy proceeding.

■ The law is settled that if a court is wholly without jurisdiction of the subject matter, the question may be raised at any time in the proceedings by the parties or by the court upon its own motion. Jurisdiction may not be conferred by inaction of the parties. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135; Mitchell v. Maurer, 293 U.S. 237, 55 S.Ct. 162, 79 L.Ed. 338; Mathers & Mathers v. Urschel, 10 Cir., 74 F.2d 591; Annotation, 12 A.L.R.2d 12. We have recently held that, "A bankruptcy court is without jurisdiction of a controversy solely and exclusively between third parties which does not involve directly or indirectly the bankrupt or his property." Central States Corporation v. Luther, Trustee, 10 Cir., 215 F.2d 38, 45. We are satisfied that this case does not come within that rule.

The general grant of jurisdiction to the bankruptcy courts is found in 11 U.S.C.A. § 11. The pertinent parts of Subdivision a, paragraphs (2), (6), (7), and (15), provide that the bankruptcy courts shall have jurisdiction to, "(2) Allow claims, disallow claims, reconsider allowed or disallowed claims, and allow or disallow them against bankrupt estates; * * * (6) Bring in and substitute additional persons or parties in proceedings under this title when necessary for the complete determination of a matter in controversy; (7) Cause the estates of bankrupts to be collected, reduced to money, and distributed, and determine controversies in relation thereto, * * *; and where in a controversy arising in a proceeding under this title an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction; * * * (15) Make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title: * * *."

■ The allegations of the bank's claim are to the effect that the RFC was obligated to purchase and was in fact the real owner of seventy-five percent of that portion of the claim which was covered by the Participation Agreement. The claim was secured by all of the debtor's assets and constituted substantially all of its indebtedness. If a controversy existed between the bank and

---

That the Blanket Participation Agreement attached to the initial pleading and cross-petition filed herein by the R.F.C. as Exhibit A be specifically enforced, and that R.S.B. is entitled to recover from R.F.C. 75 per cent of the unpaid balance of the mortgage loan from R.S.B. to the Bankrupt, after crediting all sums recov-

ered from the Bankrupt Estate, and also to recover 75 per cent of all reasonable expenses incurred by R.S.B. in accordance with Section 16 and all other provisions of the said Blanket Participation Agreement, the amount so to be recovered to be computed upon the final determination of the controversy."

the RFC upon the question of ownership of the claim and the owner's right to approve or disapprove the plan, the reorganization proceedings could not proceed without a determination of that controversy, and the inclusion of the RFC was necessary for a complete determination of the matter. In Harris v. Avery Brundage Co., 305 U.S. 160, 59 S.Ct. 131, 133, 83 L.Ed. 100 the Supreme Court said: "A court of bankruptcy has jurisdiction to 'bring in and substitute additional persons or parties in proceedings in bankruptcy when necessary for the complete determination of a matter in controversy; (and to) cause the estates of bankrupts to be collected, reduced to money and distributed, and determine controversies in relation thereto,' with exceptions not here material." We need not determine whether the RFC had the right to have the issues created by the Participation Agreement tried in a plenary suit because it appeared and requested the bankruptcy court to determine issues which that court had the power to decide in summary proceedings. The right to a plenary suit is a procedural right which may be waived. Harris v. Avery Brundage Co., supra;[6] Cline v. Kaplan, 323 U.S. 97, 99, 65 S.Ct. 155, 89 L.Ed. 97; Page v. Arkansas Natural Gas Corp., 286 U.S. 269, 52 S.Ct. 507, 76 L.Ed. 1096; MacDonald v. Plymouth County Trust Co., 286 U.S. 263, 52 S.Ct. 505, 76 L.Ed. 1093; Wiswall v. Campbell, 93 U.S. 347, 23 L.Ed. 923; In re Read-York, Inc., 7 Cir., 152 F.2d 313; Clinton Trust Co. v. John H. Elliott Leather Co., 2 Cir., 132 F.2d 299. The trustee had in his possession all of the property of the debtor. The claim and motion of the bank raised an issue as to the ownership of that claim. We are of the view that the determination of this issue was rightly a subject for proceedings in bankruptcy, and that the bankruptcy court had the power and jurisdiction to order the RFC to appear so that it could determine the lawful owners of the claim secured by a lien on the debtor's property then in the trustee's possession. Ex parte Baldwin, 291 U.S. 610, 54 S.Ct. 551, 78 L.Ed. 1020; Isaacs v. Hobbs Tie & Timber Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645; U. S. Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 32 S.Ct. 620, 56 L.Ed. 1055; Murphy v. John Hofman Co., 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327; Davidson v. Scofield, 10 Cir., 153 F.2d 7; In re Chicago Rys. Co., 7 Cir., 177 F.2d 860, certiorari denied, Chicago Transit Authority v. People of State of Illinois, 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 590; Hoehn v. McIntosh, 6 Cir., 110 F.2d 199; In re Rochford, 8 Cir., 124 F. 182.[7]

In addition, we think that in this case the estate of the bankrupt could not be completely administered without determining the controversy as to the rights and liabilities under the contract. If the bank had made demand upon the RFC to purchase under the Agreement, and the RFC had been required to do so, it then would have had the controlling vote as to reorganization and would have been entitled to its portion of the claim if the debtor's assets were distributed in bankruptcy. In Central

---

6. In this case it was said: "Furthermore, petitioners consented and agreed in open court and respondents assented to the court's disposition of the Fund in a summary proceeding. Jurisdiction to try the issues was vested in the District Court sitting as a court of bankruptcy. Since the parties had only a procedural right to have these issues tried in a plenary suit, they were at liberty to waive this right." (Footnote omitted.)

7. This rule applies in bankruptcy and reorganization proceedings. 2 Collier on Bankruptcy, 14th Ed., Sec. 23.04, p. 453 et seq.; 6 Collier on Bankruptcy, 14th Ed., Sec. 3.05, p. 579 et seq. In 3 Collier on Bankruptcy, 14th Ed., Sec. 56.04, p. 52, the text states: "It is the right and duty of the judge or the referee, where the case has been generally referred, to determine the voting power of a claim, regardless of whether or not objections have been made regarding it." (Footnotes omitted.) See also, Duda v. Sterling Mfg. Co., 8 Cir., 178 F.2d 428, 14 A.L.R.2d 899; In re Branner, 2 Cir., 9 F.2d 883.

States Corp. v. Luther, supra, we said: "But a court of bankruptcy does have jurisdiction and power to determine a dispute between third parties concerning the ownership of property in which neither the bankrupt nor the trustee has title if it is impossible to administer completely the estate of the bankrupt without determining the controversy." Cf. In re Burton Coal Co., 7 Cir., 126 F.2d 447, and In re International Power Securities Corp., 3 Cir., 170 F.2d 399. The facts in this case are somewhat similar to those in the last two cases.[8]

■ In the final analysis, what the RFC sought by its cross-petition was a determination of whether it was liable to the bank under the Participation Agreement and thereby owned a portion of the claim which the bank had filed in the bankruptcy proceedings. The bankruptcy court had jurisdiction to make that determination, and when the RFC submitted to the summary jurisdiction of the bankrutcy court for that purpose, it was bound by the result. The fact that the Referee may have relied upon Section 23, sub. b to establish jurisdiction of the bankruptcy court is immaterial. J. E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36; Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224; Jay v. Chicago Bridge & Iron Co., 10 Cir., 150 F.2d 247.

We reach the question of the liability of the RFC under the provisions of the Participation Agreement. The Agreement was dated May 16, 1945. By its terms the RFC agreed to purchase upon demand of the bank seventy-five percent of the amount due upon the loan.[9] At the time of the first disbursement on account of the loan, the bank was required to have a properly certified statement showing the borrower's financial condition as of a date not more than three months prior thereto, and that the borrower had assets in excess of liabilities. Prior to the disbursement of the loan funds, the bank was required to obtain evidence that there was no adverse change in the financial condition, organization, operations, business prospects, fixed properties, or personnel of the borrower sufficiently serious in the opinion of the bank to warrant the withholding of any disbursement. No disbursement was to be made unless the loan was secured by validly pledged collateral with an appraised value in excess of the unpaid balance of amounts previously disbursed. The Agreement further provided that no part of the proceeds of such loan could be used directly or indirectly in payment of the borrower's indebtedness to the bank incurred prior to the making of such loan, except with the written consent of the RFC.

Immediately after making a loan, the bank was required to submit a report to the RFC on a form furnished by it, showing the principal amount of the loan, the date it was authorized, the name and location of the borrower, the percentage of the RFC's participation in the loan, the disbursement, maturity, and repayment terms of the loan, and other information designated by the form. The bank was also required to furnish a monthly report to the RFC upon another form which showed each loan on which the bank had made a disbursement, each payment of principal and interest, and the date thereof, together with such other information required by the form. The Agreement provided that the bank should hold the notes evidencing each loan, all the collateral therefor, and all instruments

---

8. See also In re Cuyahoga Finance Co., 6 Cir., 136 F.2d 18; Assets Realization Co. v. Sovereign Bank of Canada, 3 Cir., 210 F. 156.

9. Paragraph 3 of the Agreement provides: "Purchase of Participation by RFC. Upon ten days' written demand by Bank, RFC will, at any time but not later than sixty days after the maturity of the note or notes evidencing any such loan, purchase for cash from Bank a participation of the Designated Percentage of the amount then due on account of such loan, with appropriate adjustment for interest and charges computed to the date of such purchase, * * *".

delivered in connection therewith. In case of default, the RFC was to be notified within ten days. It was provided, however, that subsequent to the purchase by the RFC of its participation in any loan, the bank should "upon five days' written demand therefor by RFC, transfer to RFC without recourse, the note or notes, collateral and all instruments executed in connection with such loan", and that thereafter such collateral and instruments would be held by the RFC. The RFC made this demand and the transfer was made by the bank. The holder of the note or notes was required to administer and service the loan, using reasonable care and due diligence to safeguard and protect the interest of both the bank and the RFC. Either party could terminate the agreement by giving ten days' written notice to the other party. The Agreement contained this provision: "Neither party hereto makes any express or implied warranty of any kind with respect to any such loan and neither party shall be liable to the other for any loss not due to its own negligence, * * * ".

■ On August 17, 1945, the RFC approved the loan and authorized the use of loan funds to pay the bank $140,000 which was due on prior debts, and $30,000 to pay an existing debt to another bank. The remaining $80,000 of the loan was to be advanced by the bank as new producing oil wells were developed. The production from such new wells was to be collateral for the loan. On August 30, 1945, the debtor executed and delivered to the bank its promissory note for $250,000, together with the collateral to secure its payment. In the meantime, on August 7, 1945, and August 20, 1945, the bank had disbursed to the debtor $6,000 and $5,000 to pay expenses for the development of new wells. These amounts were repaid with interest on September 12, 1945, by check. On September 13th, the bank placed to the credit of the debtor $22,500 as a disbursement of a portion of the loan, and charged the checks against that amount.

On the date that these checks were paid, the bank advised the RFC that it had disbursed a total of $192,500 on the loan. This sum included $170,000 for the discharge of prior debts, and $22,500 for part of the cost of new producing wells. The RFC contends that these amounts were for the payment of prior debts it had not authorized and that the disbursements by the bank constituted a breach of the contract.

The evidence is undisputed that the amounts were advances for the purpose of paying the drilling costs of new wells, one of the specific purposes for which the loan was made. The amounts were advanced after the RFC knew for what purposes the $80,000 balance was to be used, and they were not paid until after the loan had been approved. The new wells, along with the others, were pledged as additional security for the loan and appraisals of their value were forwarded to the RFC. The use of the loan funds to make the advances was within the contemplation of the agreement, and was not a breach thereof.

■ The RFC further contends that the bank breached the contract by permitting a default and by failing to administer and service the loan with such care and diligence as to properly safeguard and protect the interest of the bank and the RFC. During the fiscal years ending May 31, 1947 and May 31, 1948, the debtor sustained losses of $57,411.35 and $15,308.36 respectively, and in 1949, made a net profit of only $2,888.86. The bank submitted regular reports to the RFC which showed all disbursements to the debtor and the payments received. The debtor was engaged in the business of producing oil and in drilling wells for such production. The bank and the RFC knew that this was a hazardous and speculative enterprise. There is no evidence that under the circumstances the bank was not acting with due care and reasonable diligence in servicing the loan, in exercising its judgment in making disbursements, and in not declaring the contract to be in default. All the net proceeds

from the operations of the debtor were applied to the indebtedness. There was no waste of funds and no negligence by the bank. The RFC knew from the reports all the difficulties that the debtor was encountering and it made no complaint until long after the bankruptcy proceedings were instituted, and after the loan papers had been demanded and transferred to it. The Referee aptly stated, "The chief difficulty in this case is that there were too many dry holes and production was not what was anticipated. This loan * * * was known by all parties to be speculative in its nature, and RFC is in no position to use its hindsight to determine whether or not it made a good loan in the first instance."

Prior to the time of the loan, two of the bank's officers owned an interest in some of the oil and gas leases which were operated by the debtor. Before the loan was completed, these interests were transferred to, and became the absolute property of, the debtor, and were included in the mortgage given to secure the loan. The debtor also executed an assignment of the oil production from the existing wells as additional collateral. Following this, the bank officers entered into an agreement with the debtor under which they were to receive from the oil runs $600.00 per month after all payments on the loan had been made. The officers never received anything under this latter agreement since all the income from the leases was credited to the loan. The RFC contends that the bank should have made these facts known to the RFC before the latter had agreed to participate in the loan. It argues that the bank's officers had a contingent interest in the assets given as security for the loan and that their interest materially reduced the debtor's equity. It alleges that as a result of the bank's failure to disclose these facts, the true financial condition of the debtor was not disclosed to the detriment of the RFC. This is not true, since all of the leases and the personal property thereon, together with an assignment of the oil runs, were given to secure the loan and they became part of the bankrupt estate. The claim of the RFC appears to be in the nature of fraud by the bank's officers, but we agree with the Referee that there was nothing in the conduct of the officers which affected this agreement. It may be that an officer of a bank should not intermingle his personal business with that of the bank, but we find nothing in this record to sustain an allegation of fraud or that there was any lack of good faith by the bank's officers in connection with this particular loan. There is neither evidence to indicate that the officers directly or indirectly received any bonus, fee, commission, or expenses, in connection with the making of the loan, nor evidence that the bank failed to use reasonable care and due diligence in securing the collateral security for the loan or in servicing it after it was made contrary to the contract provisions. The findings of the Referee are supported by substantial evidence and are not clearly erroneous. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

Judgment affirmed.