422 F.2d 576
 In The Matter of PERSPECTRON, INC., Bankrupt.
Robert L. BALZANO, Trustee in Bankruptcy of Perspectron,
Inc., Petitioner-Appellant,
v.
AERO-DYNE CORPORATION OF ILLINOIS, Respondent-Appellee, and
United States of America, Reclamation Petitioner-Appellee.
 No. 17199.
 United States Court of Appeals, Seventh Circuit.
 Feb. 12, 1970.
 
 Anna R. Lavin, Chicago, Ill., for appellant.
 Thomas A. Foran, U.S. Atty., Richard A. Makarski, Asst. U.S. Atty., for reclamation-petitioner-appellee, John Peter Lulinski, Michael B. Nash, Asst. U.S. Attys., of counsel.
 William B. Davenport, Robert E. Pfaff, Chicago, Ill., for respondent-appellee, Aero-Dyne Corp., Jenner & Block, Chicago., Ill., of counsel.
 Before CASTLE, Chief Judge, and MAJOR and HASTINGS, Senior Circuit judges.
 MAJOR, Senior Circuit Judge.
 
 
 1
 The receiver for Perspectron, Inc., a bankrupt (Perspectron or the bankrupt), on July 28, 1966, filed a petition for a turn-over order, subsequently adopted by the bankruptcy trustee. The petition in substance alleged that on or about June 15, 1966, equipment and material of a value of approximately $150,000 was transferred from Perspectron to Aero-Dyne Corporation of Illinois (Aero-Dyne) without consideration, for the purpose of delaying and defrauding creditors of the bankrupt.
 
 
 2
 Aero-Dyne by answer denied the allegations of the petition and alleged that it was not subject to the summary jurisdiction of the court; that the United States owned the property in question and that Aero-Dyne held it on behalf of the United States, pursuant to a contract dated June 9, 1965, under which Aero-Dyne was the prime contractor; that the government contract provided that title to the property in question was in the United States; that the contract had been incorporated in Aero-Dyne's purchase order forming a subcontract with the bankrupt, and that the latter's work on the contract as a subcontractor had been terminated by Aero-Dyne upon the bankrupt's acknowledgment that it could not perform. It was further alleged that upon such termination the property was delivered to Aero-Dyne in order that work on the contract might be completed, and that Aero-Dyne had paid to the bankrupt all money received by it from the United States as progress payments on the government contract.
 
 
 3
 On September 8, 1966, the United States intervened and filed an answer, and on September 12, an amended answer, to the turn-over petition. In both it asserted ownership of the property in question. The amended answer challenged the summary jurisdiction of the court.
 
 
 4
 The referee held that he had summary jurisdiction of both the government and Aero-Dyne and, after a hearing, entered his order on March 27, 1967, by which it was determined that the claim of the trustee to the property involved and removed from the premises of the bankrupt by Aero-Dyne was superior to the claim of title of the United States. Both Aero-Dyne and the United States petitioned for review of the referee's order. The district court granted such request, considered the evidence adduced before the referee and, with the acquiescence of all parties, permitted further testimony.
 
 
 5
 On July 12, 1968, the court rendered its memorandum of decision and order, holding that real and substantial claims were advanced by Aero-Dyne and the United States which preclude the exercise of summary jurisdiction. The court concluded:
 
 
 6
 '* * * the order of the Referee finding that summary jurisdiction existed, entered without the required findings of fact and conclusions of law, and the order of the Referee finding that the Trustee's title to the property was superior to that of the United States, entered without jurisdiction, must be and hereby are reversed and this summary proceeding must be and is dismissed.'
 
 
 7
 From this order of dismissal the trustee appeals, and presents the issues for decision as:
 
 
 8
 '1. Did not the District Court err, on a Petition for Review, in preempting the Bankruptcy Court entirely for failure to make Findings of Fact, instead of remanding the matter with instructions to make the required findings?'2. Was Aero-Dyne Corporation (disdaining any right or title in itself) a 'person aggrieved' so as to qualify for the right of review under Section 39(c) of the Bankruptcy Act?
 
 
 9
 '3. Did the United States waive any challenge to the Summary Jurisdiction of the Bankruptcy Court?
 
 
 10
 '4. Could title to Perspectron Corporation's inventory vest in the United States by virtue of the contract between Aero-Dyne and the government?'
 
 
 11
 In our view, the only serious question here is whether the bankruptcy court had summary jurisdiction of Aero-Dyne and the government. If this issue be decided adversely to the trustee, any other issues are of no consequence.
 
 
 12
 The district court stated in its memorandum:
 
 
 13
 'The parties have agreed that only two questions are presented for review: First, whether the court has summary jurisdiction, and, second, whether the United States has title to the property in question. Although the questions are somewhat interrelated in that the substantiality of the United States' claim to title determines the existence of summary jurisdiction, the court would have no occasion to decide the second if summary jurisdiction is lacking.'
 
 
 14
 As noted, the district court reversed the referee's conclusion that the trustee's title to the involved property was superior to that of the United States, solely on the basis that the court was without summary jurisdiction. It follows that if the decision of the district court is affirmed, it will be without prejudice to the right of the trustee to seek relief in any appropriate plenary proceeding.[1]
 
 
 15
 The trustee argues that findings of fact were not made by the referee and the court was without authority to reverse, but should have remanded the cause for the purpose of making such findings.
 
 General Order 47 in Bankruptcy provides:
 
 16
 'Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.'
 
 
 17
 A reading of this order makes it plain that the court is vested with a wide discretion. The trustee on brief, referring to this order, states:
 
 
 18
 'However, it is impossible for a District Court to exercise that power when it cannot understand from the absence of findings how the Referee gave effect to the important questions before him. This is essential to the office of review.'
 
 
 19
 Without expressly so stating, it seems to be implicit in this argument that the court was without jurisdiction to take any action other than to remand the case to the referee for the purpose of making findings. We think the contention must be rejected. There can hardly be doubt but that the court had jurisdiction of the parties and the subject matter, and the power to proceed, particularly under the circumstances now to be related.
 
 
 20
 The record reveals that preliminary to the hearing by the district court there was a lengthy colloquy as to the issue for decision and the procedure to be followed, participated in by the court and counsel for all the parties. Mr. Davenport, attorney for Aero-Dyne, suggested that the first issue to be determined was whether the bankruptcy court had summary jurisdiction. The court inquired, 'Is there any objection to my taking this over in the light of Mr. Davenport's statement?' Mr. Simon, general counsel for the trustee, responded, 'No. I think your Honor should. We would like to dispose of this case and this would be the most expeditious way to do it.' In the colloquy Mr. Simon further stated, 'The reason I said you should hear it is to expedite the proceedings * * *.' Later, in a revealing statement, Mr. Mackey, special counsel for the trustee, expressly conceded that the issue of summary jurisdiction must first be decided.[2]
 
 
 21
 Thereupon, with the acquiescence of counsel for all parties, the district court announced that the sole issue to be tried was whether the referee had summary jurisdiction. The case was tried on this issue and decided adversely to the trustee. Insofar as we can discern from the record, neither the trustee nor any other party at any time suggested that the court was without jurisdiction or power in the matter. This issue apparently is raised here for the first time.
 
 
 22
 The cases cited by the trustee on this point are not controlling. Generally they involve the failure of a lower court to make findings which an appellate court can review. In such cases, the reviewing court is not authorized to hear additional testimony but is restricted to the findings made by the lower court. In contrast, the district court in reviewing a decision of a referee is specifically authorized to hear additional testimony. Moreover, in the instant situation counsel for all parties, including those for the trustee, expressly acquiesced in the procedure followed by the court. In our view, the trustee's complaint on this score is without merit.
 
 
 23
 Notwithstanding the posture in which the case was presented to the district court, the trustee argues here as it did before the referee, that the United States waived any right which it had to a plenary proceeding, citing O'Dell v. United States, 10 Cir., 326 F.2d 451, 455; Commercial Discount Co. v. Rutledge, 10 Cir., 297 F.2d 370, 373; Inter-State National Bank of Kansas City v. Luther, Trustee, 10 Cir., 221 F.2d 382; Reconstruction Finance Corp. v. Riverview State Bank, 10 Cir., 217 F.2d 455, 459, and James Talcott, Inc. v. Glavin, 3 Cir., 104 F.2d 851, 853. An examination of these cases and others discloses that they are of little aid to the trustee's contention because of different factual situations.
 
 
 24
 In the instant situation, the United States on September 8, 1966, filed an answer to the receiver's petition for turn-over which made no objection to the summary jurisdiction of the bankruptcy court. On the same date, however, in open court it objected to summary jurisdiction and asked leave to amend its pleading. The government on brief states that the referee orally gave the United States leave to amend its pleading within five days. In any event, within the five-day period, the United States filed its amended answer in which it objected to the summary jurisdiction. On October 3, 1966, the referee ruled that he had jurisdiction of both the government and Aero-Dyne.
 
 
 25
 Section 2(a)(7) of the Bankruptcy Act (11 U.S.C.A. 11(a)(7)) provides in part as follows:
 
 
 26
 '* * * and where in a controversy arising in a proceeding under this title an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction * * *.'
 
 
 27
 We think the government cannot 'be deemed to have consented' to summary jurisdiction. Its amended answer, either with or without the consent of the court, was filed within the time prescribed by Rule 15(a), Federal Rules of Civil Procedure. Moreover, all parties had notice on the day the government's original answer was filed that it would challenge the summary jurisdiction of the court.
 
 
 28
 In Gill v. Phillips, 5 Cir., 337 F.2d 258, the court held that the referee had erroneously determined that the party involved had consented to summary jurisdiction, and stated (page 262):
 
 
 29
 'Perhaps it is appropriate to note at the outset that consent to summary jurisdiction is not lightly to be inferred. As this Court has emphasized before, the admittedly desirable end of expeditious administration of bankrupt estates should not be allowed effectively to eliminate the protection afforded litigants by the traditional safeguards of a plenary suit, with its right to trial by jury and cross-examination of witnesses. See, e.g., Fox Jewelry Co. v. Lee, 264 F.2d 720 (5 Cir.1959); Cf. Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Therefore, we approach the issue of consent to summary jurisdiction with a certain degree of circumspection.
 
 
 30
 'We do not view any of Gill's appearances in the bankruptcy proceedings as evidencing a willingness on his part that the bankruptcy court decide the preference and fraudulent conveyance issues in summary proceedings. Consent should be inferred only from a clear manifestation by the adverse party that he is submitting a particular issue to the summary jurisdiction of the referee for determination.'
 
 
 31
 The trustee's contentions that Aero-Dyne was not a 'person aggrieved' under Sec. 39(c) of the Bankruptcy Act (Title 11 U.S.C.A. Sec. 67(c)), and that the United States did not have a real and substantial claim to title to the property which authorized them to maintain a petition for review, are based upon an intermingled state of facts which were developed at length by the parties in the court below. Even though we are not called upon to decide the merits of the contentions thus made, some statement of the facts appears to be essential.
 
 
 32
 On June 9, 1964, Aero-Dyne entered into a contract with the United States government for 76 recorder reproducers known as AN/PNH-4. This contract incorporated a progress payments clause in conformity with an Armed Service Procurement Regulation which provided in part as follows:
 
 
 33
 'Progress payments shall be made to the Contractor as work progresses, from time to time upon request, in amounts approved by the Contracting Officer upon the following terms and conditions:
 
 
 34
 '(a) Computation of Amounts. (1) Unless a smaller amount is requested, each progress payment shall be (i) 70 percent of the amount of the Contractor's total cost incurred under this contract plus (ii) the amount of progress payments to subcontractors as provided in (j) below; all less the sum of previous progress payments.
 
 
 35
 '(d) Title. Immediately, upon the date of this contract, title to all parts; materials; inventories; work in progress; special tooling as defined in the clause of this contract entitled 'Special Tooling'; nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids not included within the definition of special tooling in such 'Special Tooling' clause; and drawings and technical data (to the extent delivery thereof to the Government is required by other provisions of this contract); theretofore acquired or produced by the Contractor and allocated or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocated or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by the applicable provisions of this contract such as: the Default clause and paragraph (h) of this clause; Termination for Convenience of the clause; and the Special Tooling clause.
 
 
 36
 '(j) Progress Payments to Subcontractors. (1) The amount mentioned in item (a)(i) to (ii) above shall be the sum of (i) all the progress payments made by the Contractor to his subcontractors and remaining unliquidated, and (ii) unpaid billings for progress payments to subcontractors which have been approved for current payment in the ordinary course of business, when under subcontracts which conform to (2) below. (2) Subcontracts on which progress payments to subcontractors may be included in the base for progress payments pursuant to paragraph (a) of this clause are limited to those subcontracts in which there is expected to be a long 'lead time,' approximately six months or more between the beginning of work and the first delivery, containing subcontract progress payment provisions which (i) are substantially similar to and as favorable to the Government as this 'Progress Payments' clause, no more favorable to the subcontractor than this clause is to the contractor and on a basis of not more than 70 percent of total costs or 85 percent of direct labor and material costs (except that these percentages may be 75 percent of total costs or 90 percent of direct labor and material costs for those subcontractors which are small business concerns), and (ii) make all rights of the subcontractor with respect to all property to which the Government has title under the subcontract subordinate to the rights of the Government to require delivery of such property to it in the event of default by the Contractor under this contract or in the event of the bankruptcy or insolvency of the subcontractor.'
 
 
 37
 On August 31, 1964, Aero-Dyne issued its purchase order No. 3033 to Perspectron, covering all of the work required to be done under the government contract. Robert Moffat, president of Perspectron, signed an acceptance of the purchase order under date of September 2, 1964, and at numerous times subsequently signed similar orders referred to as the subcontracts between Aero-Dyne and Perspectron. These subcontracts among other things provided:
 
 
 38
 'All other terms and conditions of (the Government Contract), which is attached herewith and expressly made a part hereof, shall be complied with.'
 
 
 39
 During the period beginning May 25, 1965 and ending March 3, 1966, Perspectron by its officers prepared eighteen requests, in the joint names of Aero-Dyne and Perspectron, for progress payments under the government contract. Perspectron submitted said progress payment applications through Aero-Dyne to the contracting officer at Fort Meade, Md. The government made progress payments to Aero-Dyne on the government contract, which in turn remitted them in exact amount by its check to Perspectron, with accompanying government voucher setting forth the government contract number and the progress payment number. Perspectron received $152,278.80 in progress payments under the government contract, on requests prepared by Perspectron.
 
 
 40
 Moffat testified on behalf of the government before the referee that in early April 1966, he had a conversation with Harry Reagan, a representative of the National Security Agency, Fort Meade, Md., and liaison man between the agency and any contractor associated with the PNH-4. In that conversation Reagan was assured that Perspectron's progress payments were in keeping with what its books reflected. The inventory of parts acquired by Perspectron was charged to the government contract during the period covered by the progress payments' requests.
 
 
 41
 William Hriszko, an official of Perspectron, testified that it was 'very definitely a part of the procedure' at Perspectron to have each purchase order relative to a government contract contain on its face the relevant contract number. All parts ordered by Perspectron for the government contract were built to government specifications. Upon receipt of material from a vendor at Perspectron's receiving section, the parts were counted, allocated against their respective contract and placed in a hold area preparatory to inspection. They were then moved over to inspection and put in a hold area where, upon successful completion of quality control requirements they were released to production control, and from that point were put in a bonded stock area. Shipments received at Perspectron were packaged in various types of receptacles and properly identified with the part number in question and with the relative contract involved, with its appropriate nomenclature, in the instant situation the PNH-4. In the bonded stock area, all contracts were segregated under a numerical control system, under project numbers, and only that material relevant to each contract was contained in a specific area.
 
 
 42
 Edward J. Babecki, a government representative, was stationed at Perspectron as an inspector from May 1964 to the first week of March 1966. His testimony was similar to that of Hriszko as to the manner in which parts received by Perspectron were segregated so as to be identified with the various government contracts.
 
 
 43
 On May 25, 1966, Aero-Dyne by telegram notified Perspectron that because of its default, it was cancelling the balance of order No. 3033, dated August 31, 1964. The telegram in part stated:
 
 
 44
 'All material components, sub assemblies, work in process covered by progress payments one through 18 inclusive and all government tooling and equipment furnished under contract DA18-119-AMC-0919(X) shall be prepared for immediate shipment and delivery to Aero-Dyne Corp. * * *.'
 
 
 45
 On June 5, 1966, Perspectron by its officers replied by letter to this telegram, in part as follows:
 
 
 46
 'It has been determined by the officers and directors of Perspectron, Inc. that a financial reorganization of said company is required. To do so in the most timely and orderly fashion and with the best interest of the government in mind, it has been agreed that all requirements on subject will be performed by Aero-Dyne Corporation, the prime Contractor.
 
 
 47
 'As a result, the inventory as it now exists, at Perspectron, Inc. will be transferred to Aero-Dyne. Said company in turn will procure the balance of the material required for use in fabrication of the equipments to be furnished under subject contract. It should be emphasized that the technical and administrative personnel employed by Perspectron will be available to Aero-Dyne at all times during the course of the contract. This will undoubtedly alleviate any problem areas which might arise in these specific areas.'
 
 
 48
 Hriszko testified that the parts pertaining to the government contract were removed from the premises of Perspectron during the period of from about June 7 or 8 to June 11, 1966, and that to his knowledge no parts were removed which had not been identified to the government contract. Moffat testified that the items removed 'were already designated' and 'set aside.' The government contract was performed by Aero-Dyne, and the required units were eventually shipped to the government.
 
 
 49
 In view of the limited nature of the issues for decision, we deem it unnecessary to pursue further the facts as they pertain to the rights of the parties under the government's contract with Aero-Dyne or the latter's subcontract with Perspectron. Neither do we think it necessary to cite or discuss the numerous cases called to our attention which deal with pertinent principles of law. Two of such cases will suffice. In re Process-Manz Press, Inc., 7 Cir., 369 F.2d 513, a recent decision of this court, and Goggin et al. v. Consolidated Liquidating Corp. et. al., 190 F.2d 553 (CA-9).
 
 
 50
 In Process-Manz, this court reversed the district court, which had sustained the referee in holding that he had summary jurisdiction. In doing so we stated (page 516):
 
 
 51
 'The bankruptcy court is without summary jurisdiction to determine a claim without the claimant's consent where it is necessary to weigh the force of opposing credible evidence on a substantial and controverted issue of controlling fact. In re Kansas City Journal-Post Co., (8 Cir.) 144 F.2d (808) at 815. A claim is substantial if it "discloses a contested matter of right, involving some fair doubt and reasonable room for controversy,' * * * in matters either of fact or law; and is not to be held merely colorable unless the preliminary inquiry shows it is so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit, and a mere pretense.' Harrison v. Chamberlin, 271 U.S. (191) at 195, 46 S.Ct. (467) at 469 (70 L.Ed. 897).'
 
 
 52
 Goggin on its facts and reasoning supports the claims of the United States and Aero-Dyne that they are entitled to have their rights adjudicated in a plenary hearing. In that case a referee found that he had summary jurisdiction to order the turn-over of certain funds held by Consolidated which were alleged to be owed to the bankrupt. The United States Maritime Commission had notified Consolidated prior to the bankruptcy, pursuant to the provisions of the Anti-Kickback Act, to withhold monies claimed to be due the bankrupt. There, as here, the government had intervened. The district court, on review, reversed the referee. In affirming, the court of appeals stated (page 554):
 
 
 53
 'The district court on proceedings to review held that the claim which the United States was making on Consolidated was substantial, not merely colorable, hence both those parties were entitled to have their rights adjudicated in a plenary suit.'
 
 
 54
 The district court in the instant case in its memorandum opinion stated:
 
 
 55
 'Since serious questions of fact and law determine the title question, real and substantial claims are advanced by Aero-Dyne Corporation and the United States which preclude the exercise of summary jurisdiction in this case.'
 
 
 56
 With this conclusion we agree.
 
 The order appealed from is
 
 57
 Affirmed.
 
 
 
 [1]
 In fact, the trustee, after obtaining leave from the referee, instituted on September 6, 1968 a plenary proceeding against Aero-Dyne and others, seeking damages for alleged wrongful removal of the property which is the subject matter of the instant case
 
 
 [2]
 'The Court: What I was concerned about was whether the issue was before me and the matter of whether or not the bankruptcy court has summary jurisdiction is something I must decide. Isn't that right?
 Mr. Mackey: It is, your Honor.
 The Court: If I decide that the bankruptcy court does not have summary jurisdiction--
 Mr. Mackey: Have you decided that it does not? No, sir.
 The Court: I say if I were to decide.
 Mr. Mackey: Oh, if you were. Excuse me, your Honor.
 The Court: If I were, then--
 Mr. Mackey: Then that would end it.
 The Court: The trustee would be left to his plenary suit, isn't that right?
 Mr. Mackey: Yes, it is, your Honor.
 The Court: To be filed in this court or elsewhere.
 Mr. Mackey: Correct, your Honor.'